OPINION JUDGMENT ENTRY
{¶ 1} Appellant Tanya Whyde appeals from the December 10, 2003, Judgment Entry of the Licking County Court of Common Pleas, Juvenile Division, granting permanent custody of appellant's two children to the Licking County Department of Job and Family Services.
STATEMENT OF THE FACTS AND CASE
 {¶ 2} Appellant Tanya Whyde is the biological mother of Loretta Whyde (DOB 10/6/95) and Jason Caine (DOB 6/5/94).[1] On March 8, 2002, complaints were filed in the Licking County Court of Common Pleas, Juvenile Court Division, alleging that the two children were neglected and/or dependent. The complaints alleged that Loretta and Jason, who has a seizure disorder and receives growth hormone shots, did not have proper medical care and that appellant and her husband, Jeff Whyde, continually allowed other people to reside with them. An emergency shelter care hearing was held on March 12, 2002. Pursuant to a Magistrate's Order filed on the same day, Loretta and Jason were left in the custody of appellant, their mother, and their step-father, Jeff Whyde, under the protective supervision of the Licking County Department of Job and Family Services.
 {¶ 3} On March 18, 2002, an ex parte order was issued ordering that the children be removed from their home due to alleged sexual abuse. Thereafter, on March 19, 2002, amended complaints were filed. The amended complaint filed with respect to Loretta Whyde alleged, in relevant part, as follows:
 {¶ 4} "Between December 1, 2001, and January 30, 2002, Loretta was sexually molested by the mother's boyfriend, Jeremy McIntosh. Having reason to believe this, the mother continued to encourage Jeremy to come to her home, exposing both her children to a serious risk of harm. The mother met Jeremy on the Internet, as well as other men she has brought into her home."
 {¶ 5} An adjudicatory hearing before a Magistrate was held on June 4, 2002, at which the parties agreed to an adjudication of dependency and neglect.[2] The Magistrate, in a decision filed the same day, recommended that the children be adjudicated dependent and neglected and that temporary custody be granted to the Licking County Department of Job and Family Services. The Magistrate, in his Decision, made the following findings:
 {¶ 6} "Tracey Caine has had very limited involvement with Jason. Jason's medical needs have been neglected despite Agency intervention resulting in severe ear infections and non-organic failure to thrive. Loretta is victim of sexual abuse and parents have failed to protect her, continuing to expose Loretta to potential abusers."
 {¶ 7} A Judgment Entry adopting and approving the Magistrate's Decision was filed the same day.
 {¶ 8} On February 26, 2003, the Licking County Department of Job and Family Services filed a Motion for Permanent Custody pursuant to R.C. 2151.413(A) and 2151.415(A)(4). A hearing on such motion was held on June 18, 2003, before a Magistrate. The following evidence was adduced at such hearing.
 {¶ 9} Jennifer Masterson is a social worker with the Licking County Department of Job and Family Services. Masterson testified that appellant's case plan required appellant to make sure that the children received adequate medical attention and attended all medical appointments. Masterson testified that the Department was concerned about the children receiving inadequate medical care since Jason was not receiving the medication that was necessary to control his seizures and since Loretta had "chronic earaches to the point where the oozing caused irritation around her skin." Transcript at 174. Masterson further noted that both children had had head lice which resulted in their truancy from school. Masterson admitted that, due to the children's placement in foster care, "the parents were never in a position to really try to take care of the medical needs . . ." Transcript at 175. However, when asked whether she still had concerns in regard to whether appellant and her husband would be able to meet the children's medical needs, Masterson testified as follows:
 {¶ 10} "I do have concerns and that's because of what we've seen out of Tanya. We — we know that she has run out of her own medication, not making sure that her own medications have been filled, running out of the Zoloft and so forth and not being able to take that. And, you know, her own medical needs are very plentiful and using the emergency room, you know, at least on a monthly basis, more than once in a monthly basis, to get her own medical needs met.
 {¶ 11} "Q. To get — I'm sorry?
 {¶ 12} "A. Her own need — medical needs met." Transcript at 175-176. The case plan also prohibited the parents from permitting anyone to stay with them and from permitting anyone in the house under the age of 18. Masterson testified that, prior to the order of protective supervision, numerous people were in and out of the family home and that appellant and her husband had allowed some people to live with them for short periods of time to help with bills. Masterson also indicated that the Department was concerned about appellant inviting men over whom she had met over the Internet. According to Masterson, appellant and Jeff Whyde had done little to remedy this situation despite the case plan. Masterson testified that during six out of fourteen recorded home visits, both children and adults were observed in the home and that there was an investigation concerning an incident that took place in the Whyde's home involving two children. When asked, Masterson admitted that the situation was a "major concern" to the Department, which was concerned about "poor decision-making about the people that they did permit in the house that could cause harm to the children." Transcript at 178, 179. According to Masterson, appellant and her husband were repeatedly reminded that their case plan prohibited them from allowing people in the home and "it . . . got to the point where Tanya would not even acknowledge a statement that was made about how she was not supposed to have people in the home." Transcript at 179.
 {¶ 13} At the hearing, Masterson also testified that the third concern outlined in the case plan related to appellant's actions in meeting men over the Internet and permitting them to come to the house "with the expectation of having sex with Loretta and her." Transcript at 182. Masterson indicated that, as part of the case plan, appellant was required to attend counseling and had received approximately a year of individual mental health counseling and sex offender counseling. When questioned, Masterson indicated that she still had concerns about the counseling since "she [appellant] has voiced that she understands the ramifications of her actions, however, during further discussions, she will state that she really wasn't guilty of this and that she was framed." Transcript at 182-183. On cross-examination, Masterson admitted that the allegations of sexual abuse of Loretta were never substantiated.[3]
 {¶ 14} The fourth area of concern outlined in the case plan related to appellant's health issues. Appellant, according to the plan, was to have her medical needs met as directed by her doctor and to seek community services to assist her with her functioning capability. Masterson testified that appellant, who functions "in the borderline range of functioning" and is mildly to moderately retarded, runs out of medications and does not take her medications properly. Transcript at 186. Masterson further testified that she had concerns about appellant meeting her health goals since appellant "still runs out of her medication at times" and does not take her medication properly. Transcript at 187.
 {¶ 15} The case plan also required appellant and her husband to remedy their financial condition. According to Masterson, without the children's SSI income, appellant and her husband are financially strained and at risk of receiving shut-off notices. While appellant receives SSI, her husband has no income. According to Masterson, the two have had their utilities shut off due to non-payment and, in April, were evicted. The following testimony was adduced when Masterson was asked if appellant and her husband had done anything to remedy their financial strain:
 {¶ 16} "We asked for them to — we asked for Tanya to have a payee on numerous accounts and asked her to have a payee but Tanya refuses. We thought that that would be something that would be very helpful for the family. With their low amount of income and with their bills, we thought that that would be a great resource for them but Tanya did not want to have a payee. So we're — we've talked with them about Tanya obtaining employment. And we explained to her that is she would just have a certain amount of income that the S-S-I would not be touched, that she would not lose any of that. So she would be able to have some income in addition to having her S-S-I. But that was something that she just basically did not want any part of.
 {¶ 17} "Q. Were there any services referred for them to take advantage of in order to help them with their financial problems?
 {¶ 18} "A. Yeah. I — the B-V-R, the Bureau of Vocational Rehabilitation, would have been able to assist with that and I and other service providers had talked with Tanya about that and again that was something that she was not interested in." Transcript at 188-189. Appellant, according to Masterson, did not want to find employment.
 {¶ 19} While Masterson testified that appellant and her husband have had good visits with the children, she testified that "[t]here are times that sometimes the parents' and the children's roles are a little skewed . . . it's difficult to remind yourself who's the child and who's the adult." Transcript at 192. According to Masterson, appellant and her husband often had excuses why they had not started their counseling earlier and why they were missing appointments and "there was a lot of denial about them not following through on the case plan." Transcript at 195. Both children, according to Masterson, have special needs. While Jason is in the mentally handicapped,[4], multiple handicapped class in school, suffers from seizures, and receives six growth hormone shots a week, Loretta has an aide with her in her regular classroom to help her. Masterson did not believe that permanent placement of the children was possible with appellant and her husband due to their lack of financial stability, the actions of appellant in putting her children at risk for sexual abuse, and the children's multiple needs. Masterson also voiced concerns over the number of people who had been in and out of appellant's home.
 {¶ 20} The following testimony was adduced when Masterson was asked whether permanency was obtainable in any other way than permanent custody:
 {¶ 21} "A. No it's not.
 {¶ 22} "Q. Okay. And why do you feel that way?
 {¶ 23} "A. I've explored different family options that they've given me. They've given me a list of a few people within the family that they were hoping that their children could be placed with but none of the people that they gave me followed through with and they weren't viable options for permanent — permanent placement of Loretta and Jason.
 {¶ 24} "Q. Okay. And so relatives were considered?
 {¶ 25} "A. Yes.
 {¶ 26} "Q. So is it your testimony then that the services you recommended for the family and that they took advantage of did not alleviate the problems and the concerns you had?
 {¶ 27} "A. No, they did not alleviate the concerns that we had.
 {¶ 28} "Q. And that they continue today?
 {¶ 29} "A. They do continue today.
 {¶ 30} "Q. Okay. What is your opinion about whether or not Tanya and Jeff can parent them, Jason and Loretta, now and in the foreseeable future?
 {¶ 31} "A. The reason why I filed for permanent custody was because I did not believe that Tanya and Jeff would be able to parent the children now or in the foreseeable future. The concern of the people that were in and out of the home. The — the Internet chat rooms that — that Tanya talked with, the people that Tanya talked to over the Internet and brought into her home. The finances. They are still concerns today that we've seen as of recent so they still exist and I do not feel that Loretta and Jason would be safe if they return home." Transcript at 197-198.
 {¶ 32} Masterson also testified that the children's health had improved while they were in foster care, that Jason was "thriving" in school and that Loretta's behaviors in chewing on everything and other negative behaviors had decreased. Transcript at 199. Masterson noted that Jason was not having any more seizures and was growing and that Loretta's ear aches had disappeared. Based on the foregoing, Masterson recommended that the children be placed in the permanent custody of Childrens' Services.
 {¶ 33} Crystal Lapidus-Mann, a clinical social worker and counselor with Moundbuilders Guidance Center, also testified at the hearing. Lapidus-Mann testified that appellant was referred to her by Children's Services for individual counseling and that, while she asked to meet with appellant every two weeks, she saw appellant in September of 2002 and did not see appellant again until December of 2002. The goals of counseling were to help appellant understand why the children were removed from her home and to attend a sex offender's group. Lapidus-Mann testified that, as part of the sex offender based counseling, she discussed boundaries, victim empathy and high risk factors with appellant, but that she was not always sure that appellant understood. Appellant, according to Lapidus-Mann, had little understanding with respect to victim empathy and has an inability to internalize or apply concepts. Lapidus-Mann testified as follows when asked whether appellant had assumed responsibility:
 {¶ 34} "A. Tanya showed a little bit of difficulty doing this. Mainly she would do it and say how much she loved her children and that was a hard concept to help her understand what I was expecting. But she did a great job in terms of when I'd say let's work on it again. We worked on that for several sessions trying to complete it. She had made some contradictory statements in terms of state — in being responsible and I would point those out to her.
 {¶ 35} "Q. What kind of statements were those?
 {¶ 36} "A. The one that stands out to me was that she accepts full responsibility but that she was framed." Transcript at 78-79. According to Lapidus-Mann, appellant's progress during counseling has been "very slow" due to her cognitive defects. Transcript at 79. She was unable to predict how appellant would do in the future.
 {¶ 37} At the hearing, Heidi Ballengee, a parent mentor with Licking County Children's Services, testified that she had been working with appellant and her husband since October of 2002 and was to help educate them on sex abuse issues, on normal child development, on basic life skills such as housekeeping and budgeting, and on discipline. Ballengee testified that she saw "minimal improvement" with regard to safety issues and that, with respect to child development, appellant and her husband were not able to verbalize what special needs the two children had. Transcript at 98. Due to their financial problems, Ballengee spent most of the time helping appellant and her husband with budgeting. According to Ballengee, appellant and her husband usually ran out of money before the end of the month. Ballengee further testified that, because of the time spent helping appellant and her husband with getting their bills paid and maintaining their house, she was not able to work with them much on parenting issues. Ballengee also testified that she observed additional people in the home when she would visit.
 {¶ 38} Dr. Richard Jackson, a psychologist, testified at the hearing that he initially met with appellant in March of 2002 and performed psychological assessments on her. Dr. Jackson testified that, when he first assessed appellant, who he described as functioning in the "borderline range and slightly below across all of her aptitudes", she tended to deny the severity of the situation that caused the children to be removed from her home. Transcript at 124. According to Dr. Jackson, appellant's "parenting knowledge was at best variable and in some places she simply overestimated or underestimated what to expect from children, Transcript at 124-125. Dr. Jackson further testified that appellant has "quite a tendency to suspiciousness and the egocentricity that can grow out of that" and that her judgment was "at best unpredictable and in some cases just plain bad." Transcript at 125. According to the Doctor, appellant had "trouble understanding her social world." Transcript at 126.
 {¶ 39} Dr. Jackson also testified about a second evaluation that he performed on appellant. While noting that there were some positive changes, Dr. Jackson testified that appellant still had poor judgment and that she had a lot of difficulty understanding social expectations of others. Dr. Jackson noted that because of their special needs,[5], the children needed to be in a "very structured environment with very parenting — intensive approach as to child rearing . . ." Transcript at 137. When questioned about their parenting ability, Dr. Jackson opined that appellant and her husband's ability "to meet the . . . basic needs of the children would still be quite variable now." Transcript at 137-138. He further voiced concerns that "the home environment and the parenting approach would be one that is largely unpredictable." Transcript at 138.
 {¶ 40} Kelly Johnson, a case manager with Family Connection Incorporated, testified at the hearing that she has been the case manager since Jason and Loretta were placed in a foster home on March 18, 2002. Johnson testified that both children needed "a lot of structure and consistency and much one-on-one attention from the foster parents." Transcript at 149. According to Johnson, when the children were first placed in foster care, they were insecure in public settings and Loretta suffered from nightmares that left her distraught and she chewed on everything. When asked whether she observed any behavioral problems, Johnson testified that the two children lied and that such behavior had greatly decreased while the children were in foster care. Johnson also testified that Loretta's chewing problem had "completely disappeared." Transcript at 154. According to Johnson, both Loretta and Jason were doing well in their foster home, which provided a structured environment, and were better behaved. Both of the children were also very happy in school and received help with their school work from their foster parents.
 {¶ 41} The Guardian Ad Litem, in a report filed with the trial court on June 16, 2003, recommended that the motion for permanent custody be granted. The Guardian Ad Litem emphasized that appellant and her husband had a limited ability to understand and receive information, and that "the needs of the children require consistence, steady parenting and financial stability" that appellant and her husband could not provide. Furthermore, the Guardian Ad Litem noted that the two children were doing well in foster care.
 {¶ 42} Pursuant to a Magistrate's Decision filed on August 4, 2003, the Magistrate recommended that the Motion for Permanent Custody be granted. Appellant then filed objections to the Magistrate's Decision. As memorialized in a Judgment Entry filed on December 10, 2003, the trial court overruled the objections and approved and adopted the Magistrate's Decision. The trial court, in its entry, noted that "if this Court were to disregard all matters regarding any purported sexual improprieties of the mother which relate to child neglect, the record in this case nevertheless supports the conclusion of the magistrate in permanently terminating all parental rights." The trial court also noted that the childrens' biological father was in agreement with the motion to terminate parental rights.
 {¶ 43} It is from the trial court's December 10, 2003, Judgment Entry that appellant now appeals, raising the following assignments of error:
 {¶ 44} "The juvenile court erred when it overruled appellant's objections and approved, adopted, and re-affirmed the decision of the magistrate because the licking county department of job and family services failed to meet its reasonable efforts burden.
 {¶ 45} "II. The juvenile court erred when it overruled appellant's objections and approved, adopted and re-affirmed the decision of the magistrate because such decision is against the manifest weight of the evidence."
 I {¶ 46} Appellant, in her first assignment of error, argues that the trial court erred in adopting and approving the Magistrate's Decision because the Licking County Department of Job and Family Services failed to meet its burden of proving that it made reasonable efforts to eliminate the continued removal of the children from their home or to make it possible for them to return home. Appellant specifically contends that the Department's "presupposition that appellant committed certain acts of a sexual nature and requiring appellant to admit having done so to be reunited with her children violate her 5th
amendment right against self-incrimination such that there was a failure of reasonable efforts." Appellant further contends that because the Licking County Department of Job and Family Services refused to pursue an open adoption, it failed to make reasonable efforts.
 {¶ 47} Pursuant to R.C. 2151.419(A)(1), "the public children services agency or private child placing agency that filed the complaint in the case, removed the child from home, has custody of the child, or will be given custody of the child" must have "made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home. The agency shall have the burden of proving that it has made those reasonable efforts."
 {¶ 48} As is stated above, an ex parte order of removal was issued based on allegations that Loretta was being sexually abused by men that appellant met over the Internet and invited into her home for sexual contact with either appellant and/or her daughter. As part of her case plan, appellant was required to attend counseling, including sex offender counseling at Moundbuilders Guidance Center and, in fact, attended fourteen counseling sessions. At the June 18, 2003, hearing, Crystal Lapidus-Mann, appellant's counselor at Moundbuilders, testified that in order to have successfully completed such counseling, appellant would have had to admit that she had done something inappropriate. Appellant notes that Jennifer Masterson testified that the alleged sexual abuse was never substantiated. Appellant now argues that "[t]he Agency's requirement that Appellant admit to a criminal act for which she has not admitted or been convicted (i.e. "taking responsibility') in order to be reunited with her family — especially where there is no evidence offered in support of such act — is unconscionable and violates the mother's 5th amendment right against self-incrimination." On such basis, appellant further contends that the Department of Job and Family Services "failed to make reasonable efforts to eliminate the continued removal of the children from their home or make it possible for the children to return home . . ."
 {¶ 49} In the case sub judice, the Magistrate, in his decision, specifically found that "the Agency has made all reasonable and diligent efforts to prevent the children's removal from the home. The Agency has worked with the family for an extensive period of time with no significant improvement shown. The case plans previously filed herein further indicate the lengths to which the Agency has gone to prevent the children's removal and to attempt reconciliation." The record in this matter is replete with evidence establishing that the Licking County Department of Job and Family Services made reasonable efforts, independent of requiring appellant to undergo sex offender counseling, to eliminate the continued removal of Loretta and Jason from appellant and to reunite appellant and her two children. The Department developed a case plan which outlined a specific plan of reunification. As part of her case plan, appellant received help with budgeting, with parenting, and with life skills. Appellant also received assistance with meeting the special needs of her children. Based on the foregoing, we concur with appellee that even setting aside appellant's counseling, "given the amount of services offered to the Appellants, the amount of time the children were in care, their special needs, and the lack of progress as a whole on the part of the Appellants it is clear the Agency made reasonable efforts to reunify the family."
 {¶ 50} Appellant, in her first assignment, further contends that the refusal of the Licking County Department of Job and Family Services to pursue an open adoption is a failure of reasonable efforts. Appellant notes that, although both the Guardian Ad Litem and Jennifer Masterson concluded that open adoption was a valid option in this case, open adoption was not pursued. However, we concur with the trial court that the issue of open adoption is irrelevant to whether or not appellant's parental rights should be permanently terminated.
 {¶ 51} Appellant's first assignment of error is, therefore, overruled.
 II {¶ 52} Appellant, in her second assignment of error, contends that the decision granting permanent custody of Loretta and Jason to Licking County Department of Job and Family Services was against the manifest weight of the evidence. We disagree.
 {¶ 53} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment.Cross Truck v. Jeffries (Feb. 10, 1982), Stark App. No. CA-5758. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279, 376 N.E.2d 578.
 {¶ 54} R.C. 2151.414(B)(1) addresses under what circumstances a trial court may grant permanent custody. That statute provides as follows:
 {¶ 55} "(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 {¶ 56} "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 57} "(b) The child is abandoned.
 {¶ 58} "(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
 {¶ 59} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999."
 {¶ 60} R.C. 2151.414(E) sets forth factors a trial court is to consider in determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Specifically, Section (E) provides, in pertinent part, as follows:
 {¶ 61} "(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 * * * of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 * * * of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 {¶ 62} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties."
 {¶ 63} In the case sub judice, the Magistrate found that the children could not and should not be placed with either appellant or her husband within a reasonable time. At the hearing, testimony was adduced that the children's medical needs were not being met and that appellant and her husband allowed others, both children and adults, to reside with them in violation of the case plan. Testimony was also adduced that appellant was unable to meet her own medical needs, and that she did not understand the special needs of her children, and that she was not able to provide consistent, structured parenting as was needed by her children.
 {¶ 64} Thus, there was competent and credible evidence that appellant had failed to remedy the problems that initially caused the children to be removed from the home.
 {¶ 65} The next issue is whether it was in the best interest of the children to grant permanent custody. In determining the best interest of a child, the trial court is required to consider the factors contained in R.C. 2151.414(D). These factors are as follows:
 {¶ 66} "(1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster care givers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 67} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 68} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 69} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 70} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 71} As is set forth in detail in the statement of facts, testimony was adduced that the children, who both have special needs, needed to be in a structured environment that appellant and her husband could not provide. Testimony also was adduced that, when appellant, who is low functioning and is mildly to moderately mentally retarded, visited with her children, it was difficult to tell who was the adult and who was the child. In addition, there was testimony that the children's health had improved while they were in foster care, that Jason was "thriving" in school and that Loretta's negative behaviors had decreased.
 {¶ 72} Based on such testimony, the trial court did not err in finding that the children were in need of a legally secure permanent placement and that such type of placement could not be achieved without a grant of permanent custody to the agency.
 {¶ 73} Appellant's second assignment of error is, therefore, overruled.
 {¶ 74} Accordingly, the judgment of the Licking County Court of Common Pleas, Juvenile Division is affirmed.
Judgment affirmed.
Hoffman, P.J., and Boggins, J. concur.
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Licking County Court of Common Pleas, Juvenile Division, is affirmed. Costs assessed to appellant Tanya Whyde.
[1] Tracey Caine is the biological father of both children.
[2] No testimony was presented at such hearing. Rather, documents were admitted into evidence.
[3] {¶ a} This testimony of Jennifer Masterson is, at best, confusing and, at worst, highly disturbing. Ms. Masterson made representations, in a written report submitted to the court as evidence at the adjudicatory hearing, which indicated that mother's computer records revealed that mother knew her child was sexually abused. But then, at the permanent custody hearing, Ms. Masterson testified that the sexual abuse had not been substantiated.
{¶ b} In addition, this Court finds it to be incredible that neither direct testimony nor records regarding what was actually found on mother's computer was presented to the trial court at the adjudicatory hearing or the permanent custody hearing.
[4] Jason is mildly to moderately retarded.
[5] Dr. Jackson noted that Jason was mildly to moderately retarded while Loretta `s aptitudes were more in the middle range.